IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| LEAGUE OF WILDERNESS DEFENDERS-<br>BLUE MOUNTAINS BIODIVERSITY<br>PROJECT, et al., | )<br>)<br>)<br>) | |
| Plaintiffs, | ) | Civil No. 07-6283-HO |
| v. | )<br>)<br>) | O R D E R |
| LESLIE A.C. WELDON, et al., | )<br>) | |
| Defendants. | ) | |

Plaintiffs bring this suit for declaratory and injunctive relief. Specifically, plaintiffs seek a declaration that the United States Forest Service violated federal laws in planning and approving the Five Buttes Project on the Crescent Ranger District of the Deschutes National Forest and seek injunctive relief to address the injuries caused by the violations.[1]

---

[1]The court has allowed Interfor Pacific Incorporated to intervene as to the remedial phase and allowed Interfor to address plaintiffs'
(continued...)

Leslie Weldon, the Forest Supervisor of the Deschutes National Forest, signed the record of decision authorizing the Five Buttes project on June 8, 2007. The record of decision authorizes timber harvest and thinning on about 8,000 acres in the Crescent Ranger District for purposes of reducing risk of catastrophic fire and insect disease. Plaintiffs contend that defendants' actions violate the National Forest Management Act (NFMA) by authorizing logging in late-successional reserves (LSR) that is not in accordance with the standards and guidelines of the Northwest Forest Plan (NFP). Plaintiffs also contend that defendants have violated NFMA by violating the Aquatic Conservation Strategy (ACS) of the NFP by increasing overall road densities in the watershed and preventing nine ACS objectives. Plaintiffs further allege violation of the National Environmental Policy Act (NEPA) asserting defendants failed to disclose and analyze scientific opinion regarding the impacts of the project on the spotted owl, the need to reduce canopy density and the effect of limited slash removal. Plaintiffs also allege violation of NEPA through failure to ensure the scientific integrity of the conclusion that the project will reduce the risk of fire. Finally, plaintiffs contend that defendants violated NEPA by failing to consider the cumulative

---

[1](...continued)
motion for preliminary injunction and to participate in the summary judgment motions.

2 - ORDER

impacts of past, present and reasonably foreseeable future federal and non-federal actions.

The court has yet to rule on the pending motion for a preliminary injunction. Plaintiffs now seek to enjoin the entire project in its summary judgment motion.[2] Additionally, the parties filed motions to strike. The materials sought to be stricken are not necessary for the court's determination of the case and therefore the motions are denied.

### 1.   NFMA and the Northwest Forest Plan

The NFMA establishes a two-step process for forest planning. It first requires the Forest Service to develop, maintain and revise Land and Resource Management Plans ("LRMP") for each National Forest. 16 U.S.C. § 1604(a).  The LRMP guides natural resource management activities across the forest, setting standards, management area goals and objectives, and monitoring and evaluation requirements. Implementation of a forest plan occurs at the site-specific level; once an LRMP is in place, site-specific actions, are assessed by the Forest Service in this second step of

---

[2]Since the motion for preliminary injunction was argued, plaintiffs amended their complaint to only include a NFMA claim that defendants plan to allow commercial logging in Late Successional reserves (LSRs) violates the Northwest Forest Plan (NFP), a NEPA claim that defendants failed to analyze opposing scientific opinion regarding the impact of the project on habitat and the effect on fire suppression, and a NEPA claim that defendants failed to conduct an appropriate cumulative effects analysis.

3 - ORDER

the forest planning process. Site-specific decisions must be consistent with the LRMP. 16 U.S.C. § 1604(I). The Deschutes LRMP governs the management of public lands in the Deschutes National Forest.

The NFP established management requirements for all Forest Service land within the range of the northern spotted owl, and amended all National Forest LRMPs within the range of the owl including most of the Deschutes National Forest. The NFP provides guidelines for land allocations such as LSRs. The objective of the LSRs is to protect and enhance the conditions of old-growth forests that serve as habitat for the northern spotted owl and other wildlife by creating a network of large "reserves" or blocks of habitat. Northwest Forest Plan Standards and Guidelines at C-9 Administrative Record (AR) at 553).

Plaintiffs state that the project impacts on 936 acres of the Davis LSR and on 618 of those acres, the Forest Service will permit logging of live mature old-growth trees from currently suitable LSR habitat of the Northern Spotted Owl. Plaintiffs contend that the project is inconsistent with both the overall LSR objectives and the NFP standards and guidelines because among other things the logging will result, by the Forest Service's own estimation, in the degeneration of currently suitable spotted owl habitat and other late-successional conditions within the Reserve for up to 50 years.

4 - ORDER

See, e.g., AR at 9042 (return to nesting, roosting and foraging conditions may take two to five decades).

The project's two main purposes are to reduce fuel loadings and tree density so as to lessen the risk of large-scale forest loss due to insect, disease, or wildfire and to contribute to local and regional economies by providing timber and wood fiber products. Record of Decision (ROD) at 7, AR 9179. Generally, the NFP recognizes that risk reduction activities in LSRs shall "focus" on younger stands. However, where risks are high, management that goes beyond the guidelines may be considered. Standards and Guidelines for the Northwest Forest Plan at C-13, AR at 557:

> In some Late-Successional Reserves [east of the Oregon Cascades], management that goes beyond these guidelines may be considered. Levels of risk in those Late-Successional Reserves are particularly high and may require additional measures. Consequently, management activities designed to reduce the risk levels are encouraged in those Late-Successional Reserves even if a portion of the activities must take place in current late-successional habitat. While risk-reduction efforts should generally be focused on young stands, activities in older stands may be appropriate if: (1) the proposed management activities will clearly result in greater assurance of long-term maintenance of habitat; (2) the activities are clearly needed to reduce risks; and (3) the activities will not prevent the Late-Successional Reserves from playing an effective role in the objectives for which they were established.

Defendants argue that the project will clearly provide greater assurance of long-term habitat maintenance because, according to the results of a computerized simulation of the effects of wildfire on forest habitat features, expected losses of owl habitat will be

5 - ORDER

substantially reduced by active management.  See Environmental Impact Statement at 359, AR at 9010.  Defendants argue that the project is clearly needed to reduce risks because thousands of acres of late-successional habitat and large trees were lost in the Davis Fire of 2003, and the Forest Service estimates that the risk of more large-scale loss of late-structure forest is extremely high.  See id.³  Finally, defendants contend that the project will not prevent the LSRs from playing an effective role in the objectives for which they were established because, as the EIS noted, a main goal within the LSR is to minimize the likelihood of a crown fire, or--if a crown fire occurs--the likelihood that timber stands would not be able to withstand the event across large areas of the landscape.  See id.  The EIS notes that more prescribed thinning and burning my occur in ponderosa pine sites, where there is no NRF habitat, and that in mixed conifer sites, treatment would vary depending on the importance of the stand for NRF and the strategic position of the landscape.  Id. at 359-60, AR at 9010-11.

    Risk reduction activities are permitted in LSRs under limited circumstances as noted above.  Moreover, the NFP seeks to strike a

---

    ³The FEIS notes that the risk is high for large trees because "[f]or instance, existing overstory ponderosa pine and Douglas-fir can not compete with true firs in overcrowded conditions.  The trend in these forests is for the large-tree component to decline due to overcrowding from competition with young smaller trees." (emphasis added).

6 - ORDER

balance between environmental protection and resource extraction for economic benefit. However, the NFP's management directives for LSRs give priority to environmental concerns. See <u>Oregon Natural Resources Council Fund v. Brong</u>, 492 F.3d 1120, 1125 (9th Cir. 2007). The LSR at issue in this case certainly is subject to fire risks as the NFP itself recognizes greater risk east of the Oregon Cascades. While defendants present evidence that the activities may reduce risk through computer simulations, the ROD itself notes that

> However, the intensity of the treatments, their timing, and placement on the landscape may have a negative effect on the northern spotted owl, a federally listed species. Silvicultural activities aimed at making forested stands more resistant to insects, disease, and fire may also cause a short- or long-term modification or degradation of suitable habitat....
>
> These activities may reduce the quality, effectiveness, and the distribution of habitat available to the northern spotted owl in the planning area for short- and long-term as well as directly, indirectly and/or cumulatively. Consequences of the active management may have a negative impact on the northern spotted owl and its ability to establish and maintain breeding territories, find sufficient prey base habitat, and disperse across the landscape.

ROD at p. 12, AR at 9184.

In addition, the EIS notes that in those units proposed for commercial logging, the conversion of existing NRF habitat to a foraging and dispersal condition is expected to have at least a short-term effect and it will take an estimated 2-3 decades for

7 - ORDER

canopy cover to increase enough to meet NRF standards once again. EIS at pp. 115-16 AR at 8766-67.

As noted above, the NFP guidelines require the proposed management activities to "clearly result in greater assurance of long-term maintenance of habitat." The findings in the ROD are not strong enough to meet this standard. Plaintiffs are entitled to summary judgment on their NFMA claim.

2.  NEPA

Under NEPA and the APA, the Forest Service's actions, findings, and conclusions will be set aside if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Ocean Advocates v. U.S. Army Corps of Eng'rs, 361 F.3d 1108, 1118 (9th Cir. 2004) (quoting 5 U.S.C. § 706(2)(A)). Courts apply a "rule of reason" standard in reviewing the adequacy of a NEPA document. Churchill County v. Norton, 276 F.3d 1060, 1071 (9th Cir. 2001). Through the NEPA process, federal agencies must "carefully consider[ ] detailed information concerning significant environmental impacts," Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 349 (1989), but they are "not require[d] to do the impractical." Inland Empire Public Lands Council v. United States Forest Serv., 88 F.3d 754, 764 (9th Cir. 1996). Alternatively phrased, the task is to ensure that the agency has taken a "hard

8 - ORDER

look" at the potential environmental consequences of the proposed action. <u>Churchill County</u>, 276 F.3d at 1072.

Although an agency's actions under NEPA are subject to careful judicial scrutiny, courts must also defer to agency expertise, particularly with respect to scientific matters within the purview of the agency. See <u>Anderson v. Evans</u>, 371 F.3d 475, 489 (9th Cir. 2004). Review is narrow and courts are not empowered to substitute their judgment for that of the agency. <u>Citizens to Preserve Overton Park, Inc. v. Volpe</u>, 401 U.S. 402, 416 (1971); <u>The Lands Council v. McNair</u>, __ F.3d __, 2008 WL 2640001 *9-10 (9th Cir. July 2, 2008).

Plaintiffs' best argument relies on the analysis of the cumulative impacts regarding the Five Buttes Project. Additionally, plaintiffs contend that the Forest Service failed to disclose opposing scientific opinion that counsels against the decision to log large diameter trees.

A cumulative impact is defined in NEPA's implementing regulations as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions.... Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7.

9 - ORDER

A proper consideration of the cumulative impacts of a project requires "detailed information; ...[g]eneral statements about possible effects and some risks do not constitute a hard look absent a justification why more definitive information could not be provided." Ocean Advocates, 361 F.3d at 1128. The analysis "must be more than perfunctory; it must provide a useful analysis of the cumulative impacts of past, present, and future projects." Id.

Defendants argue that their cumulative effects analysis is sufficient so long as it is "useful" and focuses upon "truly "significant' effects" and can minimize the discussion of less important issues. However, under the Ninth Circuit precedent, this analysis requires two critical features not fully implemented in the cumulative impacts analysis of the EIS in this case: First, it must not only describe related projects but also enumerate the environmental effects of those projects. Second, it must consider the interaction of multiple activities and cannot focus exclusively on the environmental impacts of an individual project. Oregon Natural Resources Council Fund v. Brong, 492 F.3d 1120, 1133 (9th Cir. 2007). The EIS must offer quantified or detailed data about the effects. See Klammath-Siskiyou Wildlands Center v. BLM, 387 F.3d 989, 995 (9th Cir. 2004) (problem with cumulative effects tables is that they do not provide objective quantification of the impacts). To this end, the EIS must supply adequate data of time,

10 - ORDER

place, and scale and detail how different project plans and methods affect the environment. See Brong, 492 F.3d at 1133.

A review of the cumulative effects analysis in the EIS for this case reveals that the necessary analysis has not been undertaken. Table 3-1 of the EIS, AR at 8688, offers summary descriptions of some (six) "past, present and reasonably foreseeable future actions." The table lacks time, place, and scale information. The table omits other regeneration harvests that were conducted across the district from the 1960's through the early 1990's and alluded to elsewhere in the EIS. See EIS at pp. 143, 145, 152; AR at 8794, 8796, 8803. Again, these projects have not been quantified with time, place, and scale data. Indeed, the EIS states,

> An agency is not required to list or analyze the effects of individual past actions unless such information is necessary to describe the cumulative effects of all past actions combined. Generally agencies can conduct an adequate cumulative effects analysis by focusing on the current aggregate effects of past actions without delving into the details of the individual past actions.

EIS at p. 37; AR at 8688. This is in contradiction to current Ninth Circuit law.[4]

---

[4] The recent decision in Lands Council v. McNair, __ F.3d __, 2008 WL 2640001 (9th Cir. 2008), does not change the law in this regard. Indeed the Lands Council court specifically noted that it strongly reaffirmed that the Forest Service must fully comply with the requirements of NEPA.

11 - ORDER

Additionally, the EIS does not provide the requisite detail regarding the interaction of multiple current and future activities such as for those listed in table 3-1 of the EIS.

Plaintiffs are entitled to summary judgment on their NEPA claim regarding the cumulative impacts analysis undertaken for this project. With respect to the claim regarding disclosure of opposing scientific opinion, the court notes that upon remand of the decision to the Forest Service, the plaintiffs can present, for defendants consideration, the opposing scientific information.

Accordingly, the decision to implement the Five Buttes Project is arbitrary, capricious, and not in accordance with the law and the decision is therefore set aside and remanded back to the Forest Service to issue a new decision in compliance with the NFMA and NEPA. Defendants and defendant-intervenors are enjoined from implementing any portion of the Five Buttes Project still remaining.

## CONCLUSION

For the reasons stated above, plaintiffs' motion for summary judgment (#60) is granted and defendants' motion for summary judgment (#67) is denied. In addition, plaintiffs' motion for a preliminary injunction (#4) is denied as moot and the motions to strike (#s 18, 32, and 40) are denied.

DATED this __11th__ day of September, 2008.

                                                           __s/ Michael R. Hogan__
                                              United States District Judge

13 - ORDER